UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:14-CV-00045-JHM-HBB

CDK GLOBAL, LLC et al.                                                    PLAINTIFFS

v.

SCOTT & REYNOLDS, LLC, et al.                                            DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Partial Summary Judgment (DN 54), Plaintiffs' Motion for Summary Judgment against Defendants' Counterclaims (DN 61), and Plaintiffs' Motion for Partial Summary Judgment on Claims against Scott & Reynolds, LLC (DN 63). For the reasons stated below, the Court **GRANTS** each motion.

I.     SUMMARY OF FACTS AND CLAIMS

In 2009, Defendant James D. Scott ("Scotty") and Dan Reynolds ("Dan") organized Defendant Scott & Reynolds, LLC ("S&R"), which bought a Bobcat equipment dealership in Bowling Green, Kentucky.[1] (J.D. Scott Dep. 13:10-15:2, Aug. 11, 2015, DN 57-2 [hereinafter Scotty Dep.]). The purpose of starting this new business was to "put [their sons] into business, and we thought the Bobcat would – would be good, and so we started that business." (Scotty Dep. 134:3-12). Defendant James A. Scott ("Tony") is Scotty's son, and Defendant Robert Reynolds ("Robert") is Dan's son. (Scotty Dep. 14:8-20, 15:3-7). On May 1, 2009, Robert and

---

[1] Scotty contributed $153,000.00, representing 51% of the interest in the company, and Dan Reynolds contributed $147,000.00, representing the remaining 49% interest in the company. (Defs.' Mot. for Partial Summ. J. Ex. B, DN 54-4).

Tony were appointed to serve as agents for S&R. (Defs.' Mot. for Partial Summ. J. Ex. C, DN 54-5).

Initially, S&R used a Navision operating system for its operations. (R. Reynolds Dep., Aug. 10, 2015, 22:24-23:19, DN 55-2 [hereinafter Reynolds Dep.]). After learning that Navision would no longer be supported by Bobcat, S&R entered into agreements with Plaintiffs' predecessor (including CDK Global ("CDK"))—ADP—in November 2012 for a dealer management system, a computer network, and a telephone system for the business. (First Am. Compl. Ex. A, DN 28-1; First Am. Compl. Ex. B, DN 28-2; First Am. Compl. Ex. D, DN 28-4; First Am. Compl. Ex. F, DN 28-6; First Am. Compl. Ex. G, DN 28-7).

At the end of 2012, Scotty and Dan transferred their respective ownership interests in S&R to their sons. (Defs.' Mot. for Partial Summ. J. Ex. F, at 1, DN 54-8). In 2013, S&R began branding the "outdoor" side of the business as "Yard Park." (Reynolds Dep. 80:7-81:8). S&R also opened a satellite store that offered the same goods and services as the initial location. (Reynolds Dep. 83:15-85:15).

On February 12, 2014, S&R notified CDK that S&R was going out of business and would like to "get out of" its contract with CDK.[2] (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. I, at 2, DN 56-9). CDK provided a quote of $81,856.19, good through February 28, 2014, in order for S&R to buyout the contract. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. I, at 1). On February 26, 2014, CDK sent another email that, *inter alia*, updated the total amount required for the buyout to $83,504.95. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. J, DN 56-10). On March 7, 2014, CDK sent another email requesting a date by which it could expect

---

[2] The emails between S&R and CDK's predecessor include references to contracts between S&R and Plaintiff IP Networked Services, Inc. ("IPNS"), which is a subsidiary of CDK. (First Am. Compl. 2-3). When the Court discusses CDK in the context of the contracts in this case, CDK includes IPNS except where noted.

full payment of the contract, and an update as to the status of negotiations between S&R, the entity buying the Bobcat dealership from S&R, and others. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. J, at 1).

On March 7, 2014, Scotty and Tony organized a new limited liability company called Yard Park, LLC ("Yard Park"). (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. K, DN 57-7). Yard Park is "a lawn and garden store," as well as a full service dealership of certain types of equipment. (Reynolds Dep. 113:24-115:22). On March 18, 2014, S&R sold substantially all of its assets to E.K.D. Bowling Green, LLC. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. O, DN 57-11). Before becoming totally defunct, S&R transferred funds to Yard Park. (Scotty Dep. 100:17-107:2). According to Scotty, S&R was "pretty much done" by January 23, 2015. (Scotty Dep. 104:16-18).

On April 1, 2014, Plaintiffs filed this lawsuit, and subsequently filed their First Amended Complaint on December 3, 2014. (Compl., DN 1; First Am. Compl., DN 28). Plaintiffs have asserted claims of breach of contract, unjust enrichment, conversion, veil piercing/successor liability, aiding and abetting, interference with business relations, and fraudulent conveyances, and for possession of Plaintiffs' equipment. (Comp. ¶¶ 11-109; First Am. Comp. ¶¶ 18-145). On January 22, 2015, Defendants filed their Amended Answer to First Amended Complaint and Counterclaim asserting a counterclaim for breach of contract. (Am. Answer to First Am. Compl. & Countercl. 4, DN 35).

In Defendants' motion, they seek summary judgment as to whether Plaintiffs can pierce the corporate veil of S&R and obtain personal judgments against Scotty, Tony, Robert, and Yard Park. (Defs.' Mem. in Supp. of Mot. for Partial Summ. J. 1, DN 54-1 [hereinafter Defs.' Mem. in Supp.]). Plaintiffs seek summary judgment on Defendants' counterclaims relating to the

contractual agreements. (Pls.' Mot. for Summ. J. on Defs.' Countercls. 10-19, DN 61 [hereinafter Pls.' Mot. – Countercls.]). Plaintiffs also seek partial summary judgment on their claims against S&R. (Pls.' Mot. for Partial Summ. J. 4-5, DN 63).

## II. JURISDICTION

This Court has original jurisdiction of "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, as is between . . . citizens of different States . . . ." 28 U.S.C. § 1332(a)(1). Plaintiffs assert in their First Amended Complaint that Plaintiffs are a limited liability entity and a corporation both organized under the laws of Delaware with their principal place of business in Illinois. (First Am. Compl. 2-3). All of CDK's members are citizens or residents of states other than Kentucky. (First Am. Compl. 2). Defendants are limited liability companies organized under the laws of Kentucky and whose members are all residents of Kentucky, and the individual Defendants are residents of Kentucky. There is, therefore, complete diversity. The balance allegedly owed under one contract at issue in this case is $125,900.47, which exceeds the jurisdictional threshold of this Court. (First Am. Compl. 6).

## III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of any material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 322. If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the

existence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV.     DISCUSSION

### A.     Defendants' Motion for Partial Summary Judgment

#### 1.     *Piercing the Corporate Veil – Availability*

The First Amended Complaint includes a claim to pierce the veil of S&R and Yard Park based upon allegations that those entities "were and are nothing more than the mere instrumentalities and/or alter egos" of Scotty, Tony, and Robert, and that if the Court does not allow Plaintiffs to pierce the veils of the limited liability companies, it would "subject [Plaintiffs] to an unjust loss . . . [and] sanction fraud and injustice."  (First Am. Compl. 18-19).  In seeking summary judgment on this claim, Defendants argue:  (1) that Kentucky does not recognize LLC veil-piercing; and (2) Plaintiffs have not satisfied their burden under Kentucky law to pierce the corporate veil of S&R.  (Defs.' Mem. in Supp. 7-14).

In support of their assertion that veil-piercing is inapplicable to limited liability companies, Defendants rely on *Pannell v. Shannon*, 425 S.W.3d 58 (Ky. 2014). In *Pannell*, the Kentucky Supreme Court noted that "while several decisions have assumed that [veil piercing applies to limited liability companies] . . . the question appears to have been raised in only one case," which avoided the question by applying Ohio law. *Pannell*, 425 S.W.3d at 75 n.15 (internal citations omitted). The court also noted that there are "strong arguments for why LLC veil piercing should not be allowed." *Id.* (internal citation omitted) (citation omitted). The Kentucky Supreme Court did not, however, hold that a limited liability corporation was not subject to veil piercing.[3] *See Pannell*, 425 S.W.3d at 76.

Plaintiffs instead rely on *Turner v. Andrew*, 413 S.W.3d 272 (Ky. 2013), in which the Kentucky Supreme Court stated that piercing the veil "can also apply to limited liability companies." *Turner*, 413 S.W.3d at 276-77. Plaintiffs argue that "*Pannell* . . . does not overturn the *Turner* decision, and undoubtedly, the Court would not have attempted to do so in a footnote." (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. 19, DN 56 [hereinafter Pls.' Resp.]). Plaintiffs also cite a number of cases from Kentucky state courts and federal courts interpreting Kentucky law to support the proposition that state law allows the piercing of the veil with regard to limited liability companies. (Pls.' Resp. 20-21).

Most pertinent to this issue are several cases decided after *Pannell*. The first is *Kentucky Petroleum Operating Ltd. v. Golden*, No. 12-164-ART, 2015 WL 927358 (E.D. Ky. Mar. 4,

---

[3] Defendants also rely on KRS 275.150, which discusses the liability of members of an LLC. It provides, *inter alia*, that "no member . . . or agent of a limited liability company . . . shall be personally liable *by reason of being a member* . . . or agent of the limited liability company . . . for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise." KRS 275.150(1) (emphasis added). *See also Racing Inv. Fund 2000, LLC v. Clay Ward Agency, Inc.*, 320 S.W.3d 654, 656 (Ky. 2010) (noting that KRS 275.150 "contains a strong, detailed declaration of personal immunity . . . .").

2015), where our sister court pierced the veil of a Kentucky limited liability company, as it did with other types of business entities that were found to be alter egos of each other in a "subsidiary-parent-grandparent structure." *Id.* at *6-8. Similarly in *JP Morgan Chase, National Ass'n v. Golden Ingot, LLP*, No. 3:14CV-00493-JHM, 2015 WL 94145 (E.D. Ky. Jan. 6, 2015), a sister court pierced the veil of several interrelated Kentucky limited liability companies and found that the plaintiff had sufficiently alleged that the companies were each other's alter egos to survive a motion to dismiss on that basis. *See id.* at *2-4. The penultimate case is *In re Howland*, 516 B.R. 163 (Bankr. E.D. Ky. 2014), in which the court found that the defendant's argument that veil piercing does not apply to limited liability companies was "not persuasive." *Id.* at 167 n.2.

Finally, Plaintiffs cite *Tayloe v. Sellco Two Corp.*, No. 2012-CA-001445-MR, 2014 WL 3674252 (Ky. App. Aug. 12, 2015). In *Tayloe*, the Kentucky Court of Appeals agreed with the defendant "that Kentucky law does not distinguish between corporations and LLCs when discussing liability or piercing the corporate veil." *Id.* at *4. Defendants note that "while this case was initially published, the Supreme Court of Kentucky ordered the Court of Appeals to make the case unpublished." (Defs.' Reply to Mot. for Partial Summ. J. 13, DN 60). The Supreme Court did not, however, grant discretionary review. *See Tayloe*, No. 2012-CA-001445-MR, 2014 WL 3674252, at *1.

It appears that the question of whether a court may pierce the veil of a limited liability company remains an unsettled question in Kentucky courts. Consistent with this Court's decision in other cases, however, the principles underlying veil-piercing in the context of corporations apply with equal force to limited liability companies. *See Pro Tanks Leasing v. Midwest Propane & Refined Fuels, LLC*, 988 F. Supp. 2d 772, 782-93 (W.D. Ky. 2013)

(applying Kentucky law and analyzing whether the piercing the corporate veil was warranted under the facts of that case); *Sudamax Industria E Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 847-49 (W.D. Ky. 2007). Accordingly, the Court will consider whether to pierce the veil under the facts of this case.

### 2. *Piercing the Corporate Veil – Application*

As a preliminary matter, it is helpful to distinguish the relationships, and the lack thereof, between certain parties. First, it is uncontested that the contracts at issue are between Plaintiffs and S&R alone. Neither Scotty, Tony nor Robert signed any contract either individually or as a guarantor. Second, from shortly before the contracts where entered into until S&R alerted Plaintiffs that it was going out of business, the only members of S&R were Tony and Robert. Finally, there is no formal relationship between S&R and Yard Park—*i.e.*, neither entity owned an interest in the other to form a parent-subsidiary relationship.

Plaintiffs could conceivably recover from Scotty, however, by virtue of his involvement with Yard Park. This would require a two-step process: (i) Plaintiffs must show that S&R and Yard Park are related in such a way that Yard Park is responsible for S&R's obligation (including its contracts with Plaintiffs), and (ii) Plaintiffs must then show that Yard Park's veil should be pierced in order to hold Scotty liable for Yard Park's imputed obligations to Plaintiffs.

Kentucky law dictates that there are two dispositive elements in the analysis to determine whether to pierce a corporate veil: "(1) domination of the corporation resulting in a loss of corporate separateness *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Inter-Tel Techs., Inc. v. Linn Station Props.*, 360 S.W.3d 152, 165 (Ky. 2012). There are a number of factors that courts consider

when determining whether to pierce a corporate veil, and each one is not universally relevant to every case. *See id.* at 163-64.

While Defendants deny the existence of any facts warranting piercing in this case, Plaintiffs argue in opposition that Defendants lost their "separateness" through: (1) failure to observe legal formalities and disregard of entity distinctions; (2) grossly inadequate capitalization; and (3) a high degree of control by the individual Defendants over S&R in a way that caused harm to Plaintiffs. (Pls.' Resp. 24-29).

As to the first *Inter-Tel* element, S&R did follow some company formalities and maintain distinction between itself and its members and agents. S&R had an operating agreement. (Defs.' Mot. for Partial Summ. J. Ex. B). On May 1, 2009, S&R's members executed a document vesting agency in Robert and Tony. (Defs.' Mot. for Partial Summ. J. Ex. C). On December 31, 2012, Scotty and Dan Reynolds executed a document gifting their respective shares in S&R to Tony and Robert. (Defs.' Mot. for Partial Summ. J. Ex. F). Scotty did not draw any salary or commissions from S&R. (Scotty Dep. 51:19-21; 136:15-16). While Robert was paid a salary for almost all of the years S&R operated and also received a commission at one point, he did not receive any money simply from owning an interest in the company. (Reynolds Dep. 96:21-98:18). Additionally, S&R had its own bank account and filed its own tax returns. (Reynolds Dep. 94:7-9, 171:8-10).

Admittedly, S&R did not adhere to strict company formalities. Scotty could not estimate how many meetings S&R had and did not have any record of those meetings. (Scotty Dep. 49:13-21). Formal notice was not given to members before meetings, and no minutes were taken of any of the meetings. (Scotty Dep. 49:10-12, 50:1-3). Robert could not recall how many meetings the members of S&R had once he became a member but agreed no minutes were kept.

(Reynolds Dep. 90:11-91:5). S&R had no employment contracts with any of its employees, including Tony and Robert. (Reynolds Dep. 96:17-20). In this regard, however, it is important to note that the limited liability company form is generally subject to less corporate formalities than a corporation. *See* Mark A. Sargent & Walter D. Schwidetzky, *Limited Liability Handbook* § 3.85 (Sept. 2015) ("LLC statutes typically provide fewer formalities with which owners must comply than is the case for corporations or limited partnerships that have corporate (or LLC) general partners.").

The fact that S&R's members did not have regularly scheduled meetings and did not keep minutes of their meetings, coupled with lack of employment contracts, is insufficient to overcome the fact that: (1) S&R had an operating agreement; (2) the members held meetings; (3) S&R had a separate company bank account; and (4) S&R filed annual tax returns. On balance, the Court finds that, even in the light most favorable to Plaintiffs, S&R maintained sufficient corporate formalities and separateness from Tony and Robert that piercing S&R's veil in order to hold them liable would be inappropriate.

Plaintiffs assert that the amount of money that the individual Defendants received from S&R is not reasonable, intimating that they siphoned funds from S&R. (Pls.' Resp. 24). Tony received $8,137.99 from August 2012 to March 2014. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. Q, at 2, DN 57-13). Robert received $151,343.62 from February 2012 to March 2014. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. Q, at 2). Scotty received a total $12,412.00 from checks issued between February 2012 and November 2014 by S&R, though neither he nor Robert could explain why he received that amount and Scotty thought the checks might have been written to Scotty for the benefit of Tony. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. Q; Scotty Dep. 126:1-131:11; Reynolds Dep. 145:18-147:11). Assuming

*arguendo* that the money given to Scotty did go to Tony, Tony averaged an income of $1,027.50 per month from S&R. Robert averaged $5,820.90 per month. Particularly given that Robert earned commissions as well as a salary, these numbers do not indicate that Tony and Robert were siphoning funds from S&R.

Next is the question of whether Yard Park may be held liable for S&R's obligations to Plaintiffs. Kentucky case law dictates that an unrelated LLC cannot be liable for the obligations of a dissolved LLC unless it is a successor entity, it was a shareholder of the dissolved LLC, it agreed to assume the debts of the dissolved LLC, or a novation occurred. *See Bear, Inc. v. Smith*, 303 S.W.3d 137, 146 (Ky. App. 2010). There have been no assertions by any of the parties that Yard Park was a member of S&R, that it agreed to assume S&R's debt to Plaintiffs, or that a novation occurred. The only remaining theory, and the one advanced by Plaintiffs, is that Yard Park is a successor entity to S&R. (Pls.' Resp. 26).

A successor in interest is "one who follows another in ownership or control of property." *Dynabody Fitness Ctr., Inc. v. Skynexx, LLC*, No. 2003-CA-001574-MR, 2004 WL 2367231, at *2 (Ky. App. Oct. 22, 2004) (internal quotation marks and alteration omitted). As the Kentucky Court of Appeals has noted:

> In order to be a "successor in interest," a party must continue to retain the same rights as [the] original owner without [a] change in ownership and there must be a change in form only and not in substance. . . . In [the] case of corporations, the term ordinarily indicates statutory succession as, for instance, when [a] corporation changes its name but retains the same property.

*Id.* (alterations in original) (citations omitted)

In this case, Yard Park operates out of a building that is a former satellite store of S&R. (Scotty Dep. 56:14-19). Yard Park began its existence with the inventory owned by S&R because Scotty bought the inventory from S&R and either loaned or gave it to Yard Park.

(Scotty Dep. 82:3-8, 83:25-84:24, 117:10-118:17). Yard Park sells and repairs lawnmowers, just as it did when that location was a satellite store of S&R, but Yard Park expanded the facility, carries different product lines and no longer sells Bobcat equipment. (Scotty Dep. 58:5-59:3; Reynolds Dep. 113:24-114:16). Four of Yard Park's six employees previously worked for S&R. (Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. L, at 2, DN 57-8). While Tony and Robert were the final members of S&R, Scotty and Tony are the only members of Yard Park. (Defs.' Mot. for Partial Summ. J. Ex. F, at 1; Pls.' Resp. to Defs.' Mot. for Partial Summ. J. Ex. K). Yard Park did take over two of S&R's obligations: a vehicle loan and another loan, possibly for a trailer. (Scotty Dep. 87:10-88:11).

Even in the light most favorable to Plaintiffs, the Court concludes that Yard Park is not a successor to S&R. While there are similarities between the two—*e.g.*, Yard Park operates at the location of S&R's satellite store and Yard Park acquired S&R's inventory via Scotty—Yard Park is more than a change in form of S&R. Yard Park sells the same types of equipment, but does not sell Bobcat equipment, which appears to have been S&R's primary function. Yard Park did not assume all of S&R's obligations, including its obligations to Plaintiffs, but instead assumed only two loans tied to specific pieces of equipment. Yard Park also did not hire exclusively from S&R. Importantly, the two entities do not have an identical set of members: while Tony was a member of S&R at the time of its dissolution, Scotty was not, and Robert—the other member of S&R—is not a member of Yard Park. Yard Park thus entails a change of ownership as well as a change in form. Therefore, Yard Park is not a successor entity of S&R and is not liable, as successor, for S&R's debt to Plaintiffs. Thus, as to Scotty, it is not necessary to review whether Yard Park's veil should be pierced to hold Scotty derivatively liable for S&R's obligations to Plaintiffs.

In sum, the Court declines to pierce S&R's veil as the factors render it inappropriate to do so. Yard Park is not a successor entity of S&R and is not liable for its obligations to Plaintiffs, and Scotty is likewise not liable on those claims. Accordingly, Defendants' motion for partial summary judgment is therefore **GRANTED**.

  **B.** <u>**Plaintiffs' Motion for Summary Judgment on Defendants' Counterclaims**</u>

In seeking summary judgment on Defendants' counterclaims, Plaintiffs argue: (1) that because the contracts at issue were between Plaintiffs and only S&R, S&R is the only defendant in a position to assert a counterclaim; (2) that contracts at issue in this matter bar the asserted counterclaims; and (3) S&R cannot provide sufficient evidence of damages. (Pls.' Mot. Countercls., 10, 11, 15). In response, S&R asserts that the evidence supporting Defendants' affirmative defenses to Plaintiffs' claims, including estoppel and misrepresentation, create a genuine issue of material fact, and that the liquidated damages provisions of the contracts at issue are unenforceable as penalties. (Def.'s Resp. to Pls.' Mot. for Partial Summ. J. 1, 5, DN 65 [hereinafter Def.'s Resp. – Countercls.]).

As to Plaintiffs' first argument, it is well-taken. S&R is the only defendant that was a signatory to the contracts at issue, and as a result, S&R is the only defendant who has standing to assert counterclaims against Plaintiffs. The Court also notes that only S&R responded to Plaintiffs' motion, and that it did not address this argument in its response. Absent any presentation of law or facts supporting their ability to assert counterclaims against Plaintiffs, despite not being signatories to the contracts at issue, the Court must grant Plaintiffs' motion as against all Defendants other than S&R.

As to Plaintiffs' second argument, S&R does not contest the contents of the contracts, including the provisions cited by Plaintiffs that would appear to bar S&R's counterclaims.

Instead, S&R argues that Plaintiffs made material misrepresentations that warrant rescission of the contracts through the doctrines of promissory estoppel and fraudulent inducement. (Def.'s Resp. – Countercls. 1-5). The material misrepresentations in question all relate to "the verbal representations to S&R that they could meet the request of an early spring implementation timeframe." (Def.'s Resp. – Countercls. 2).

Under Kentucky law, a claim of promissory estoppel may not be based on oral representations made prior to entering into a contract. *See Taylor v. Integra Bank, N.A.*, No. 2006-CA-002082-MR, 2008 WL 399435, at *4 (Ky. App. Feb. 15, 2008). S&R's claim for rescission based on promissory estoppel therefore fails. Next, each of the agreements in question contains a merger and integration clause or similar language having the same effect. (First Am. Compl. Ex. A, at 13-14; First Am. Compl. Ex. D, at 2; First Am. Compl. Ex. F, at 9). "When the negotiations are completed by the execution of a contract, the transaction, so far as it rests on the contract, is merged in the writing." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 260 (Ky. App. 2007) (citation omitted). "In general, a 'merger clause' is a contractual provision to the effect that the written terms of the contract may not be varied by *prior agreements* because all such agreements have been merged into the written document." *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (emphasis in original) (internal quotation marks omitted) (citing 17A C.J.S. *Contracts* § 577 (2013)).

Merger and integration clauses do not, however, save a contract entered into by fraud or mutual mistake. *See Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970). S&R claims that the contract should be rescinded because it was fraudulently induced to enter into the contracts at issue not only by Plaintiffs' statements regarding the time necessary to have the system running, but also because "S&R was compelled to sign the agreements . . . before

Plaintiffs would provide a written implementation plan to the company." (Def.'s Resp. – Countercls. 3).

Under Kentucky law:

It is well-established that a plaintiff seeking to prevail on a claim of fraud must establish, by clear and convincing evidence, six elements: (1) that the declarant made a material misrepresentation to the plaintiff, (2) that this misrepresentation was false, (3) that the declarant knew it was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Radioshack*, 222 S.W.3d at 262 (citation omitted). "For a declarant's misrepresentation to be used as the basis for fraud, it must relate to an *existing or past* fact." *Id.* (emphasis added) (citation omitted).

Plaintiffs argue that, even in the light most favorable to S&R, any promises that the system *would* be installed by a certain time were related to the future, not an existing or past fact. (Pls.' Reply in Supp. of Mot. for Partial Summ. J. 7, DN 69 [hereinafter Pls.' Reply – Countercls.]). This argument is well-taken. A statement that something *will* be done by a certain date does not relate to an existing or past fact. Accordingly, S&R's claim of fraudulent inducement fails.

S&R is left with no arguments for rescission of the contracts. It is therefore bound by the terms of the contracts that dictate that it may not file counterclaims. The Court will therefore grant Plaintiffs' motion for summary judgment as to all counterclaims.

Finally, in its response S&R argues that the liquidated damages provisions of the contracts constitute a penalty or forfeiture, and are therefore unenforceable. S&R points to the deposition of corporate representative John Bolling ("Bolling"), noting that he could not "shed

15

any light regarding the basis of the liquidated damages formula stated in the contracts." (Def.'s Resp. – Countercls. 5-8).

Under Kentucky law:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

*Mattingly Bridge Co., Inc. v. Holloway & Son Constr. Co.*, 694 S.W.2d 702, 705 (Ky. 1985) (citing Restatement (Second) of Contracts § 356(1) (1981)). Liquidated damages are a "useful commercial tool," but nonetheless labor under two restrictions: that they be used only when "actual damages sustained from a breach of contract would be very difficult to ascertain" and where the amount fixed is not grossly disproportionate to the damages actually sustained. *Id.*

S&R argues that because Plaintiffs cannot explain the justification for the amount of the liquidated damages and have not shown that it equates to a fair representation of its lost profits, it is a penalty. (Def.'s Resp. – Countercls. 8-9). S&R notes that "Plaintiffs admit that the liquidated damages formula is the same irrespective of the fact that they perform no future work, receive all equipment back, and/or a new business stepped into the same business following the payment of the liquidated damages." (Def.'s Resp. – Countercls. 8).

S&R erroneously attempts to place the burden on Plaintiffs to show that the liquidated damages are not grossly disproportionate. (Pls.' Reply – Countercls. 9-12). Because S&R is challenging the liquidated damages provisions, it bears the burden of proving that they are penalties. *See C.E. Pennington Co. v. B&H Elec. Contractors, Inc.*, Nos. 2001-CA-001242-MR, 2001-CA-001243-MR, 2003 WL 22461515, at *13 (Ky. App. Oct. 31, 2003). S&R relies almost solely on the fact that Bolling could not explain precisely why the amount of damages is 70% of the total due on the contract as opposed to some other amount. This argument, however,

disregards the terms of the CDK Master Services Agreement ("CDK MSA") in which the S&R agreed that the liquidated damages provisions were "mutually determined to be fair and reasonable in light of the anticipated harm caused by the breach, the difficulties of proof of loss, and the unavailability of any adequate remedy." (Pls.' Mot. for Partial Summ. J. Ex. B, ¶ 16(A), DN 64-2). Likewise, the Court is unpersuaded by S&R's argument that the existence of another entity at the same location that S&R previously occupied negates the enforceability of the liquidated damages provisions. Accordingly, S&R has not met its burden to prove that this is a penalty.

S&R has failed to establish that the liquidated damages provisions of the contracts operate as penalties. The Court will therefore grant summary judgment to Plaintiffs on this issue.

## C. Plaintiffs' Motion for Partial Summary Judgment on Claims Against S&R

In the final motion under consideration, Plaintiffs argue that they are entitled to summary judgment as to certain of their claims because S&R breached the contracts at issue in this case and the damages from those breaches are calculable. (Pls.' Mot. for Partial Summ. J. 4-6). S&R has admitted that it has not made a payment to Plaintiffs pursuant to the contracts since March 1, 2014. (Pls.' Mot. for Partial Summ. J. Ex. A, at 3, DN 63-1). While Plaintiffs allege other breaches, failure to pay according to the terms of the contract is a quintessential breach of contract. Accordingly, the Court will grant Plaintiffs' motion as to Counts 1, 6, and 11.

Plaintiffs also seek summary judgment as to Counts 2, 7, and 12, all of which seek judgment against S&R for attorneys' fees and costs of collection. (Pls.' Mot. for Partial Summ. J. 1; First Am. Compl. 6, 10, 14). Count 2 seeks attorneys' fees and costs of collection due to S&R's breach of the CDK Master Services Agreement ("CDK MSA"). (First Am. Compl. 6-7).

The CDK MSA provides that, in the event of default, S&R "agrees to reimburse [CDK] for any and all expenses [CDK] may incur, including reasonable attorney's fees, in taking any of foregoing actions," one of which is "declare all amounts due and to become due under this Agreement . . . immediately due and payable." (First Am. Compl. Ex. A, at 13). Count 7 seeks attorneys' fees and costs of collection due to S&R's breach of the equipment leases. (First. Am. Compl. 10-11). The equipment leases each contain a provision similar to that found in the CDK MSA. (First Am. Compl. Ex. D, at 2, 6, 10, 14; First Am. Compl. 14-15). Because S&R remains bound by the terms of the contracts, it is also bound by the provisions allowing for attorneys' fees and costs in the CDK MSA and the equipment leases.

Count 12 seeks attorneys' fees and costs of collection due to S&R's breach of the IPNS Master Services Agreement ("IPNS MSA"). The IPNS MSA, however, does not contain such a provision, nor do its schedules. (*See* First Am. Compl. Ex. F; First Am. Compl. Ex. G).

Count 16 alleges cross-default through the CDK MSA. (First Am. Compl. 16-17). The CDK MSA "DEFAULT BY CLIENT; REMEDIES UPON DEFAULT" section includes as a method of default: "default in the performance of any of [the client's] obligations under any agreement with any affiliate of ADP (or any assignee thereof or successor thereto) . . . ." (First Am. Compl. Ex. A, at 13). CDK is the successor of ADP, and IPNS is a subsidiary of CDK. (First Am. Compl. 2, 3). Accordingly, the cross-default provision in the CDK MSA yields the result that a default in the equipment leases or IPNS MSA is also a default in the CDK MSA. As discussed above, S&R has defaulted on all three contracts. Therefore, the cross-default provision has been triggered, and the Court will grant summary judgment as to Count 16.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Partial Summary Judgment (DN 54) with respect to the claims seeking to pierce the corporate veil of Scott & Reynolds, LLC against Defendants James D. Scott, James A. Scott, and Robert Reynolds; **GRANTS** Plaintiffs' Motion for Summary Judgment Against Defendants' Counterclaims (DN 61); and **GRANTS** Plaintiffs' Motion for Partial Summary Judgment on Counts 1, 2, 6, 7, 11, 12, and 16 as follows:

    1.    Plaintiffs are awarded $127,804.88, plus interest at a rate of 1.5% per month from and after April 1, 2014, for breach of the CDK Master Services Agreement; $75,957.37, plus interest at a rate of 1.25% per month from and after April 1, 2014, for breach of the equipment leases; $52,722.91, plus interest at a rate of 1.5% per month from and after April 1, 2014, for breach of the IPNS Master Services Agreement; and reasonable attorneys' fees and costs.

    2.    Plaintiffs **SHALL** submit an affidavit detailing attorneys' fees and costs within fourteen (14) days of the entry of this Memorandum Opinion and Order.

*[Signature]*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

August 18, 2016

cc:    counsel of record