UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

**CIVIL ACTION NO. 1:14-CV-00045-JHM**

**CDK GLOBAL, LLC, and
IP NETWORK SERVICES, INC.**                                                          **PLAINTIFFS**

**V.**

**SCOTT & REYNOLDS, LLC,
YARD PARK, LLC, JAMES D.
SCOTT, JAMES A. SCOTT, and
ROBERT REYNOLDS**                                                                    **DEFENDANTS**

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on the motion for summary judgment by Defendants Scott & Reynolds, LLC ("S&R"), Yard Park, LLC ("Yard Park"), James D. Scott ("Scotty"), James A. Scott ("Tony"), and Robert Reynolds ("Robert"). (DN 83.) Fully briefed, this matter is ripe for decision. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**I. BACKGROUND**

In 2009, Dan Reynolds ("Dan") and Scotty organized S&R as a limited liability company, with Scotty maintaining a 51% interest in the company and Dan maintaining a 49% interest. (Articles of Organization [DN 85-1] at 6.) This LLC bought a Bobcat equipment dealership in Bowling Green, Kentucky, and continued to operate the dealership until March 18, 2014, when the dealership was sold to E.K.D. Bowling Green, LLC. (Asset Purchase Agreement [DN 57-11] at 2.) During the operation of the dealership by S&R, both Robert Reynolds, Dan's son, and Tony Scott, Scotty's son, were employed there. On December 31, 2012, Dan gifted his entire 49% interest in the LLC to Robert, and Scotty gifted 49% of his interest to Tony while

retaining a 2% interest. (Written Consent In Lieu of Meeting of the Members [DN 85-5] at 1.) No further transfers of interests have occurred since then.[1]

On November 9, 2012, S&R entered into a contract with ADP Dealer Services, Inc., the predecessor in interest to Plaintiff CDK Global, LLC. (DN 28-1.) On November 26, 2012, S&R also entered into a contract with Plaintiff IP Network Services, Inc. (DN 28-6.) Pursuant to these contracts, the Plaintiffs provided S&R with a dealer management system, a computer network, and telephone system for their business, as well as technical support for these services and all necessary equipment. (*Id.*, DN 28-4.) This system was installed and operational for S&R by April of 2013. (Dep. Robert Reynolds [DN 55-2] at 31:6–11.)

In addition to selling Bobcat equipment, S&R also sold lawn mowers and other lawn and garden products. In 2013, S&R began to brand the lawn and garden side of their business as "Yard Park," although both the lawn and garden business and Bobcat dealership were operated by S&R as one store. (*Id.* at 80:7–81:8.) Additionally, S&R opened a "satellite store" in 2013 that was also branded as "Yard Park" and sold the same lawn and garden products as the original location; however, this location lacked a service department. (*Id.* at 85:2–9.)

Around the fall of 2013, Bobcat informed S&R that it would no longer be a Bobcat dealer and had until March 1, 2014, when "the plug was being pulled." (*Id.* at 101:25–104:10.) This led S&R to sell the property where the dealership was located, the office furniture, rental fleet, shop tools, and supplies to E.D.K. Bowling Green, LLC, on March 18, 2014. (*Id.*; Asset Purchase Agreement [DN 57-11] at 2.) A representative of S&R notified the Plaintiffs on February 12, 2014, that the dealership would undergo a change of ownership and inquired about

---

[1] The record is unclear as to whether S&R continues to formally exist, as there is no evidence that the LLC has been formally wound up or that articles of dissolution have been filed with the Kentucky Secretary of State, which are required under S&R's operating agreement for dissolution and termination. (DN 85-1, at 9.) However, Scotty agreed in testimony that "the company [was] pretty much done by January 23rd, 2015." (Dep. James D. Scott [DN 55-1] at 104:16–18) (hereinafter "Dep. Scotty").

how to proceed with the contracts between S&R and the Plaintiffs. (Email Chain [DN 56-9] at 2.) The Plaintiffs notified S&R on February 14, 2014, that a buyout of the contracts would cost S&R $81,856.19, with that amount later being amended on March 7, 2014, to $83,504.95. (*Id.*; Email Chain [DN 56-10] at 1.) Letters were then sent on March 24, 2014, to S&R that demanded payment under both contracts and the equipment lease, stating that S&R was in default for losing the Bobcat franchise rights and failing to make scheduled payments, among other reasons. (Demand Letters [DN 28-3, 28-5, 28-8].)

On March 7, 2014, Yard Park, LLC, filed articles of organization with the Kentucky Secretary of State, listing Scotty and Tony as members.[2] (Articles of Organization [DN 57-7] at 5.) Yard Park, LLC, operates a lawn and garden store at the same location as the former S&R satellite store, as the property is personally owned by Scotty. (Dep. Scotty [DN 55-1] at 40:11, 59:3.) Scotty and Tony continue to operate this store.

On April 1, 2014, the Plaintiffs initiated this lawsuit, with their First Amended Complaint asserting claims of breach of contract, unjust enrichment, conversion, veil piercing/successor liability, aiding and abetting, interference with business relations, and fraudulent conveyance, while also seeking possession of any of Plaintiffs' equipment retained by the Defendants. (DN 28.) In their answer, the Defendants asserted a counterclaim for breach of contract. (DN 35.) On August 18, 2016, this Court granted the Defendants' motion for summary judgment as to the Plaintiffs' claim for veil piercing, the Plaintiffs' motion for summary judgment as to the Defendants' counterclaim for breach of contract, and the Plaintiffs' motion for summary judgment as to the Plaintiffs' claim for breach of contract. (DN 73.) Presently, the Defendants have moved the Court for summary judgment as to the Plaintiffs' claims for aiding and abetting

---

[2] The Articles of Organization state Scotty holds a 51% interest and Tony holds a 49% interest, but in Scotty's deposition, he twice stated that he only owns 15% of Yard Park and Tony owns 85%. (Dep. Scotty [DN 55-2] at 53:23, 60:4.)

3

(Count 18), interference with business relations (Count 19), and fraudulent conveyances (Count 20). (DN 83.)

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. SUCCESSOR LIABILITY

As a preliminary matter, the Court must address whether the Plaintiffs' claim for successor liability remains viable, as this will determine the scope of the Plaintiffs' claim for aiding and abetting. While the Defendants do not address this claim in their motion for summary judgment, the Plaintiffs state in their response that summary judgment should not be granted on this claim, as the Defendants have failed to raise the issue, and even if they had, summary judgment would not be appropriate. (DN 84, at 14–17.) The Defendants argue in their reply that the Court's prior opinion granting summary judgment on the veil piercing claim foreclosed the successor liability claim as well. (DN 90, at 2–3.)

Count 17 of the Plaintiffs' First Amended Complaint is entitled "Veil Piercing/Successor Liability – Against All Defendants." (DN 28, at 17.) After stating the grounds upon which the claim is asserted, the Complaint states that the Plaintiffs "should be permitted to pierce the veil of [S&R] and Yard Park and collect the amounts owed by [S&R] and/or Yard Park directly from" any of the Defendants. (*Id.* ¶ 133.) Immediately following this, though, the Complaint states that, "in the alternative, [S&R] and Yard Park share such continuity of ownership, management, personnel, physical location, and business operations, among other factors, such that Yard Park is the successor to [S&R] obligations" to the Plaintiffs. (*Id.* ¶ 134.) The Defendants moved this Court for summary judgment "with regard to the piercing of the corporate veil," (DN 54-1, at 1) and this Court granted the motion. (DN 73, at 5–13.)

Neither veil piercing or successor liability are causes of actions; instead, they are "merely a means by which a complainant can reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation." *Weingartner*

*Lumber & Supply Co., Inc. v. Kadant Composites, LLC*, 2010 WL 996473, at *4 (E.D. Ky. Mar. 16, 2010) (internal citations and quotations omitted). Under Kentucky law, veil piercing is a separate theory of liability from successor liability. *See id.* at *4–8 (analyzing each theory of liability separately); *Excel Energy, Inc. v. Cyprus Amax Coal Sales Corp.*, 2008 WL 4127147, at *1 (W.D. Ky. Sep. 4, 2008) (recognizing that plaintiff was not attempting to recover under a veil-piercing theory but rather a successor liability theory). However, this Court's August 18, 2016 Memorandum Opinion and Order necessarily foreclosed the Plaintiffs' success under a theory of successor liability when it granted summary judgment as to the veil piercing claim, as the claims were intertwined so as to require both to be decided.

First, it is important to understand what theory of liability would apply to each Defendant, something the Plaintiffs have not made entirely clear. (*See* Pl.'s Resp. to Def. Mot. for Summ. J. [DN 56] at 32) ("[I]t is clear that there are sufficient facts to pierce the limited liability veils and *treat Defendants as one entity . . .*") (emphasis added). S&R has an obligation to the Plaintiffs. To hold Yard Park liable for this obligation, Yard Park would have to be a successor entity to S&R; piercing S&R's veil would not impose an obligation on Yard Park, as Yard Park is not a member of S&R. Conversely, to hold the members of S&R (Scotty, Tony, and Robert) liable for this obligation, the Court would have to pierce S&R's veil, as Scotty, Tony, and Robert are not successor entities to S&R.

However, Count 17 of the Complaint seeks to "pierce the veil of [S&R] *and* Yard Park" so as to hold the members of each (Scotty, Tony, and Robert for S&R; Scotty and Tony for Yard Park) all liable. (Pl.'s First Amend. Compl. [DN 28] ¶ 133) (emphasis added). The Defendants moved for summary judgment as to the veil piercing claim, in which the Plaintiffs sought to pierce the veils of both S&R and Yard Park. In order to decide whether Yard Park's veil should

6

be pierced, it was necessary to decide whether Yard Park is a successor entity to S&R, since Yard Park would have no obligation to the Plaintiffs that would make veil piercing necessary *unless* it were a successor entity to S&R. Thus, it was necessary to decide the issue of Yard Park's successor liability in order for the Court to fully resolve the veil piercing claim against S&R and Yard Park. Therefore, the August 18, 2016 Memorandum Opinion and Order fully disposed of Count 17 by granting summary judgment in favor of the Defendants.

### B. INTERFERENCE WITH BUSINESS RELATIONS

Count 19 of the Complaint alleges that each Defendant "intentionally interfered with the valuable and established contractual relationships" between the Plaintiffs and S&R. In order to recover for tortious interference with a contract, a plaintiff must prove (1) the existence of a contract; (2) knowledge of the contract; (3) intent to cause a breach of that contract; (4) breach of the contract caused by the defendant's actions; (5) damages; and (6) that the defendant had no privilege or justification to excuse its conduct. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. 2012) (citations omitted). However, "[t]he failure to perform a contractual obligation typically does not give rise to a cause of action in tort . . . [it is only] if a plaintiff can establish the existence of an independent legal duty, [that] he may maintain an action in tort even though the acts complained of also constitute a breach of contract." *Francis v. Armstrong Coal Reserves, Inc.*, 2012 WL 777271, at *4 (W.D. Ky. Mar. 7, 2012) (quoting *Mims v. Western-Southern Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007).

First, the claim against S&R fails the independent legal duty rule. The contracts with which S&R allegedly interfered were the contracts between S&R and the Plaintiffs. S&R owed the Plaintiffs a duty to not breach the contract, and nothing more. The Court has already granted

the Plaintiffs' motion for summary judgment as it pertains to S&R's breach, and the independent legal duty rule prohibits a recovery in tort for the same breach.

Turning to the claim as it pertains to the remaining Defendants, the Plaintiffs have failed to establish evidence indicating that Scotty, Tony, Robert, or Yard Park caused the breach of the contracts between the Plaintiffs and S&R. The demand letters sent from the Plaintiffs to S&R on March 24, 2014 (DN 28-3, 28-5, 28-8), indicate that S&R breached the contracts in the following ways:

> (1) by losing its franchise right to operate its heavy equipment dealership (DN 28-3, 28-5, 28-8);
>
> (2) by failing to pay all amounts when due (DN 28-5, 28-8);
>
> (3) by attempting to sell equipment leased under the contract (DN 28-5);
>
> (4) by conducting an asset sale under the lease (DN 28-5);
>
> (5) by failing to own the required amount of ownership in the location where the services are provided under the contract (DN 28-8); and
>
> (6) by defaulting under the other agreements. (DN 28-3.)

The record is devoid of any evidence explaining when or how criteria (3), (4), or (5) occurred, meaning that the record is similarly devoid of any evidence indicating that Scotty, Tony, Robert, or Yard Park caused these events to occur. And criteria (6) is reflexive, implicated when only one of the other five criteria have been demonstrated, meaning that separate consideration of it is not necessary. Thus, the only two criteria that merit consideration are the loss of the franchise rights and failure to pay.

First, the Plaintiffs have not demonstrated that Scotty, Tony, Robert, or Yard Park caused S&R to lose its franchise rights to operate the Bobcat dealership. The only evidence indicating why S&R lost the franchise rights comes in the depositions of Robert and Scotty. Robert stated:

> Basically, when Bobcat came to us and said that we -- you know, we're kind of being forced out, and that we had 'till March 1st, 2014 to either sell the business or, you know, or the plug was being pulled. At that same time, Bobcat was out trying to recruit another Bobcat dealer to take over the territory . . . The business was, you know, that was kind of being given to [the dealership's buyer] by Bobcat company, the franchise, so we really just had a facility to sell.

(Dep. Robert Reynolds [DN 55-2] at 101:25–102:5, 103:16–18.) Scotty further stated that S&R had no choice but to relinquish its franchise since "GE, the one that was financing our floor plan and everything pulled the plug on us." (Dep. Scotty [DN 55-1] at 41:9–11.) This evidence indicates that the franchise rights were lost due to either Bobcat's unhappiness with the performance of S&R as a Bobcat dealership or Bobcat's desire to allow a different ownership group to take over S&R's geographic territory. The Plaintiffs have put forth no evidence of an alternative theory as to why the franchise rights were lost so as to create a dispute as to a material fact.

Second, the Plaintiffs have not demonstrated that Scotty, Tony, Robert, or Yard Park caused S&R to become delinquent in its obligations to the Plaintiffs. There is no dispute that S&R failed to pay per the terms of the contract; such was the basis for this Court granting the Plaintiffs' motion for summary judgment on it claim of breach of contract against S&R. (DN 73, at 17.) But the fact that S&R failed to pay does not establish that Scotty, Tony, Robert, or Yard Park caused the failure to pay. The record indicates that it was not within the job descriptions of

9

any of the individuals to ensure that bills were timely paid,[3] and there is no evidence that any of these individuals instructed an S&R employee to withhold payment. Merely being a member of a company that misses a payment does not mean that each individual member caused that payment to be missed.

Nor is there evidence that demonstrates Yard Park caused S&R to not pay the Plaintiffs; while there are allegations of fraudulent conveyances between S&R and Yard Park that the Court has yet to address, even if such conveyances occurred and left S&R without adequate funds to pay the Plaintiffs, S&R would still be the entity that *caused* the payment to be withheld, as it would have been within its power to pay before the conveyance was made. The Plaintiffs have asserted no evidence beyond the fact that the Defendants were generally present and involved with S&R at the time that S&R failed to pay, and this is not sufficient evidence to create a dispute as to whether the Defendants caused the breach to occur. Thus, the claim against each Defendant for interference with business relations must fail, and the Defendants' motion for summary judgment is **GRANTED**.

### C. FRAUDULENT CONVEYANCES

Count 20 of the Complaint asserts that S&R has "transferred assets and other collateral with the intent to delay, hinder, or defraud creditors and other persons, including [the Plaintiffs]," in violation of KRS 378.010 and 378.020. (DN 28 ¶ 142.) Because Scotty, Tony, Robert, and Yard Park were the recipients of these allegedly fraudulent transfers, the Plaintiffs seek to avoid the transfers and levy on the transferred assets. (*Id.* ¶¶ 143, 144.) KRS 378.010 and 378.020 have been repealed; however, that repeal was not effective until January 1, 2016, after all of the

---

[3] Scotty testified, and Robert confirmed, that Scotty was not involved in the day-to-day operations of the company. (Dep. Scotty [DN 55-1] at 30:23–24; Dep. Robert Reynolds [DN 55-2] at 91:12–13). Robert worked a variety of jobs, but he never rose to general manager or worked in accounting. (Dep. Robert Reynolds [DN 55-2] at 21:23–22:4, 88:23–89:8). Tony never had a formal job title and would mostly run errands when needed. (*Id.* at 92:5–11.)

alleged fraudulent transfers, meaning that the statutes would apply to the conveyances in this case.  KRS 378.010 states that "[e]very gift, conveyance, assignment or transfer . . . made with the intent to delay, hinder or defraud creditors . . . shall be void as against such creditors[.]"  KRS 378.020 similarly states that "[e]very gift, conveyance, assignment, transfer, or charge made by a debtor . . . without valuable consideration therefor, shall be void as to all his then existing creditors[.]"

"In actions to set aside a conveyance for fraud, the fraud must be established by clear and convincing evidence."  *Hayes v. Rodgers*, 447 S.W.2d 597, 600 (Ky. 1969).  However, "Kentucky acknowledges the difficulty of finding direct evidence of fraudulent intent—companies do not regularly announce plans to defraud creditors."  *Ky. Petroleum Operating Ltd. v. Golden*, 2015 WL 927358, at *4 (E.D. Ky. Mar. 4, 2015).  Therefore,

> [w]hen sufficient 'badges of fraud' are shown that it would be unreasonable, in the absence of evidence to the contrary, to find that the transfer was not fraudulent . . . the plaintiff is entitled to a directed verdict [or summary judgment] in the absence of countervailing proof tending to show that the transfer or conveyance was made fairly and without intent to defraud the creditor.

*Russell Cty. Feed Mill, Inc. v. Kimbler*, 520 S.W.2d 309, 311 (Ky. 1975) (citations omitted). There are four generally recognized badges of fraud that Kentucky courts consider:

(1) where the transfer or conveyance is between persons who are related or occupy a confidential relationship;

(2) where the transfer or conveyance contains false statements and recitals of consideration, or inadequate consideration;

(3) where the transfer or conveyance is made by a debtor in anticipation of a suit against him or after a suit has begun or is pending against him; and

> (4) where the transfer or conveyance is made by a debtor who transfers all or any appreciable part of his property when he is insolvent or financially embarrassed.

*Id.* at 311–12; *Bank of Josephine v. Hopson*, 516 S.W.2d 339, 341 (Ky. 1974).

The Plaintiffs in this case have not moved for summary judgment; instead, they argue that there are genuine disputes of fact that necessitate a trial. Therefore, to avoid summary judgment, the Plaintiffs must first demonstrate sufficient badges of fraud so that it "would be unreasonable . . . to find that the transfer was not fraudulent." *Russell Cty. Feed Mill*, 520 S.W.2d at 311. If sufficient badges of fraud are not shown, summary judgment is appropriate for the Defendants. If sufficient badges of fraud are shown, however, summary judgment will still be appropriate if the Defendants can then show "countervailing proof . . . that the transfer or conveyance was made fairly and without intent to defraud the creditor." *Id.* If there remains a genuine dispute of a material fact after these showings have been made, summary judgment will be denied.

In their response to the Defendants' motion for summary judgment, the Plaintiffs identify eight categories of alleged fraudulent transfers. The Court will address each in turn.

### 1. INVENTORY TRANSFERS

The Plaintiffs allege that S&R fraudulently transferred inventory to Scotty, who then either gave or loaned the inventory to Yard Park. (Pl.'s Resp. to Def.'s Mot. for Summ. J. [DN 84] ¶ 18.) Scotty's deposition and associated financial records indicate that Scotty bought $403,000 worth of inventory from S&R on April 14, 2014, and $84,804.84 worth of inventory from S&R on April 23, 2014. (Dep. Scotty [DN 55-2] at 114:12–116:18). As to the badges of fraud present in this transaction, Scotty is a member of S&R and therefore is in at least a fiduciary relationship with S&R. Both transactions were also made in April 2014, after the

demand letter had been sent to S&R on March 24, 2014, raising questions as to whether the conveyance was made in anticipation of a suit. And the transaction took place after the sale of the dealership to E.K.D. Bowling Green, which, after paying off bank loans on the property, left S&R at least close to insolvency. (Dep. Robert Reynolds [DN 55-2] at 110:8-15 (". . . and then there was really nothing left after [paying the bank loans]").) This sufficiently demonstrates that these conveyances bear badges of fraud.

However, S&R has a quite convincing argument in rebuttal: the inventory did not belong to S&R. There appears to be no dispute that the inventory Scotty purchased from S&R was not owned outright by S&R but was rather "floor-planned" by different vendors of S&R, meaning that these vendors allowed S&R to possess the inventory on its sales floor and pay the vendors once the items ultimately sold. (Dep. Scotty [DN 55-1] at 81:13–15.) If these pieces of inventory had not been sold by S&R, the vendors alone would have had a right to this property, not another creditor like the Plaintiffs. Thus, when Scotty purchased the inventory, he actually injected funds *into* S&R, rather than siphoning assets out of it, which S&R then could use to pay off the amounts owed on the individual pieces of inventory and any other obligations like the one owed to the Plaintiffs. The fact that these funds were not ultimately used to pay the debt owed to the Plaintiffs, or that there were no funds left over after fulfilling the floor plan obligations, does not make Scotty's initial purchase of the inventory fraudulent. This is sufficient proof that the transfer was made without intent to defraud the Plaintiffs, and no reasonable juror could conclude that the transfer was made with the intent to defraud. Therefore, the motion for summary judgment as to this conveyance is **GRANTED**.

## 2. PAYMENTS FROM SCOTTY TO YARD PARK

The Plaintiffs argue that Scotty transferred a total of $706,256.75 to Yard Park, either in the form of a gift or loan, that includes the above inventory that Scotty purchased from S&R. (Pl.'s Resp. to Def.'s Mot. for Summ. J. [DN 84] ¶ 19.)  Yard Park's balance sheets list this amount as a loan (DN 58-9, at 1), but Scotty testified that he was not sure if he would ever seek repayment from Yard Park. (Dep. Scotty [DN 55-1] 124:12–23.)  The Plaintiffs assert that "the clear implication [of these transactions] is that they were unfair to the failing S&R." (Pl.'s Resp. to Def.'s Mot. for Summ. J. [DN 84] ¶ 19.)  Regardless of the Plaintiffs perception of these transactions, any gift or loan made by Scotty to Yard Park does not implicate KRS 378.010 or 378.020.  The Plaintiffs were creditors of only S&R, not Scotty or Yard Park.  Neither Scotty nor Yard Park qualifies as a "debtor" under KRS 378.020, and the Plaintiffs have failed to explain how a gift or loan made between entities that have no obligations to the Plaintiffs could be made with the intent to defraud them.  Therefore, the motion for summary judgment as to this conveyance is **GRANTED**.

## 3. YARD PARK'S ASSUMPTION OF S&R'S DEBTS

Yard Park assumed two "Long Term Liabilities" from S&R: one from Ford Credit for $22,476.98 for a truck, and one from Independence Bank for $29,298.10 that was likely for a trailer, for a total of $51,775.08. (Dep. Scotty [DN 55-1] 87:10–88:5; DN 85-9.)  As to the badges of fraud attached to this transaction, the conveyance was between companies with common members, as Tony and Scotty were members of both S&R and Yard Park. While this is not the quintessential confidential relationship, the Court will at least consider the relatedness of the two entities through their common members.  But there is no evidence of the timing of these transactions that may shed light on how close they came to S&R's insolvency or the Plaintiffs'

14

demand for payment. Likewise, there is no evidence on the valuation of these items so as to determine whether assumption of the debts alone was adequate consideration for the property.

The badges of fraud in this transaction are not sufficient to even require rebuttal evidence from the Defendants. The property the Plaintiffs accuse S&R of disposing of so as to avoid its obligation to the Plaintiffs was clearly encumbered by obligations to other creditors. If the liabilities were not assumed by someone who would make the required payments to those creditors, the property would have been repossessed by those creditors, and the Plaintiffs would have no right to that property to fulfill S&R's obligation to them. There is not sufficient evidence of an intent to defraud the Plaintiffs for the claim to survive the Defendants' motion. Therefore, the motion for summary judgment as to this conveyance is **GRANTED**.

### 4. PAYMENTS TO ROBERT REYNOLDS

The Plaintiffs argue that $151,343.62 was transferred from S&R to Robert "without sufficient explanation or support." (Pl.'s Resp. to Def.'s Mot. for Summ. J. [DN 84] ¶ 22.) As to the badges of fraud, Robert is a member of S&R and is at least in a fiduciary relationship with S&R. But the timing of these payments significantly diminishes the likelihood that they were made with the intent to defraud the Plaintiffs. These payments began February 14, 2012 and occurred roughly twice a month until March 14, 2014. (DN 85-10, at 1.) All of these payments occurred before the demand letters were sent by the Plaintiffs, and only $6000 was paid to Robert after the first quote on the buyout of the contract came on February 14, 2014. (*Id.*) Thus, only a very small portion of the total amount at issue could have arguably been made in anticipation of a suit by the Plaintiffs. Further, no payments occurred after the dealership was sold on March 18, meaning that there is no evidence that the transfer was made when S&R was near insolvency.

The Defendants have adequately rebutted any badges of fraud associated with this transaction. Although Robert did not have an employment contract, these payments were made as compensation to him, based on both his salary and the commissions he earned from sales. Thus, there was no mere recital of consideration with these transactions. The Court has already determined in its prior opinion that Robert averaged $5,820.90 per month while working at S&R, which hardly "indicate[s] that [he was] siphoning funds from S&R." (DN 73, at 11.) And the only amount that even has any indicia of having been transferred with the intent to defraud the Plaintiffs, the $6000 made after February 14, 2014, was made in the form of three $2000 payments occurring every two weeks, a pattern of compensation that dates back to at least the beginning of 2014. (DN 85-10, at 1–2.) Based on this evidence, no reasonable juror would conclude that any of the payments made to Robert over the course of two years were made with the intent to defraud the Plaintiffs. Therefore, the motion for summary judgment as to this conveyance is **GRANTED**.

### 5. PAYMENTS TO TONY SCOTT

The Plaintiffs also contest $8,137.99 that was paid to Tony from S&R. (Pl.'s Resp. to Def.'s Mot. for Summ. J. [DN 84] ¶ 23.) This analysis is almost identical to that of S&R's payments to Robert. Tony is in a fiduciary relationship with S&R as a member of the LLC, but all payments were made before the demand letter was sent and before the dealership was sold, with the last payments coming on March 17, 2014. Any badges of fraud on these transactions are easily rebutted by the record. Tony was paid $475 every two weeks going back to at least August 2013, a regularity that does not suggests an intent to defraud the Plaintiffs. (DN 85-10, at 1.) Just as with Robert, the Court has already found that these payments hardly indicate a siphoning of funds from S&R, as the payments are reasonable in light of the work done by Tony

16

over the course of the business. (DN 73, at 11.) Therefore, the motion for summary judgment as to this conveyance is **GRANTED**.

### 6. PAYMENTS BY YARD PARK TO TONY

The Plaintiffs also note that Tony has been paid $15,545.11 by Yard Park. (Pl.'s Resp. to Def.'s Mot. for Summ. J. [DN 84] ¶ 23.) Just as with the loans or gifts made by Scotty to Yard Park, these transfers do not implicate the fraudulent conveyance statutes. Tony and Yard Park owe no debt to the Plaintiffs, and the Plaintiffs fail to explain how a transfer from Yard Park to Tony could have been made with the intent to defraud a creditor of neither. Therefore, the motion for summary judgment as to this conveyance is **GRANTED**.

### 7. PAYMENTS TO SCOTTY

Scotty received a total of $12,412 from S&R from February 2, 2012, until November 7, 2013. (DN 85-10, at 1.) Again, Scotty is in a fiduciary relationship with S&R as a member of the LLC. There is some doubt as to what these payments were for, which raises the possibility that there was inadequate consideration for these transfers. But the timing of these transfers is again telling: all occurred well before S&R received a demand for payment from the Plaintiffs on March 24, 2015, or S&R sold the dealership on March 18, 2014.

It is a close call as to whether these are sufficient badges of fraud so as to require rebuttal evidence, but regardless of their sufficiency, the Defendants have adequately rebutted any suggestion of fraud. Scotty stated that he believed the checks were to pay Tony for his work done for S&R, and the record supports this contention. (Dep. Scotty [DN 55-1] at 127:18–128:21.) First, Scotty, Tony, and Robert all testified that Scotty would assist Tony in managing his money due to an accident Tony suffered that caused him difficulties in maintaining his finances. (Dep. Scotty [DN 55-1] at 129:5–7; Dep. Robert Reynolds [DN 55-2] at 95:5–11; Dep.

17

Tony Scott [DN 57-9] at 44:3–6.) Second, there is almost no overlap between the time period where Scotty was paid by S&R and the time period where Tony was paid by S&R. Scotty received payments approximately monthly for amounts under $2000 from February to November 2012. (DN 85-10, at 1.) And Tony did not begin receiving his bi-weekly $475 payments until August 2013. (*Id.*) Thus, the record supports Scotty's belief that the payments he received were to support Tony during that period, as S&R only began paying Tony directly at a later date and in smaller sums. The Plaintiffs' argument becomes all the more unconvincing since these transfers began at least eight months before S&R entered into the relevant contracts with the Plaintiffs. Based on this evidence, the Plaintiffs' claim must fail. Therefore, the motion for summary judgment as to this conveyance is **GRANTED**.

### 8. TRANSFER FROM S&R TO YARD PARK

Finally, the Plaintiffs argue that $13,050.04 was transferred from S&R to Yard Park with an intent to defraud the Plaintiffs. As to the badges of fraud surrounding these transactions, the Court will again give some consideration to the relatedness of the entities through their common members. There is also some doubt as to what these payments were for, which raises the possibility that there was inadequate consideration for these transfers. The timing of these transfers also places a badge of fraud on the conveyances: the payments were made through three checks written in May, June, and July of 2014, after the demand for payment had been made and after the sale of the dealership that left S&R close to insolvency. (DN 85-10, at 1, 3.) Thus, the Plaintiffs have sufficiently demonstrated that these conveyances bear badges of fraud.

In rebuttal, the Defendants do not offer much explanation for these payments. When discussing at least two of the three checks at issue, Scotty stated, "I have no idea about these checks. I didn't sign the checks. I never followed them, anything." (Dep. Scotty [DN 55-1] at

103:2–3.) Robert also testified that he was working for the new Bobcat dealership at that time and had no involvement with S&R when these checks were written. (Dep. Robert Reynolds [DN 55-2] at 152:4–5.) Based on these arguments, there is a genuine dispute as to whether these transfers were made with the intent to defraud the Plaintiffs. Therefore, the motion for summary judgment as to this conveyance is **DENIED**.

### D. AIDING AND ABETTING

Count 18 of the Complaint alleges that all five defendants "aided and abetted in and acted in concert or pursuant to a common design to" defraud the Plaintiffs. (DN 28 ¶ 136.) The only claim that has survived the Defendants' motion for summary judgment is the claim for fraudulent conveyance between S&R and Yard Park, making it the only claim to which any other Defendant could have aided or abetted. The Defendants argue, though, that Kentucky law does not recognize a claim for aiding and abetting a fraudulent conveyance.

In *CNH Capital A.M., LLC v. Hunt Tractor, Inc.*, 568 F. App'x 461, 469–70 (6th Cir. 2014), the Sixth Circuit determined that the Kentucky statutes at issue "do not explicitly allow recovery from a beneficiary of the [fraudulent] transfer" and that a plaintiff can only recover on a claim of fraudulent conveyance from "a direct transferee or transferor[.]" Consistent with this opinion, federal district courts in Kentucky have held that "there is no cause of action for aiding and abetting a fraudulent conveyance." *Bank of Am., N.A. v. Corporex Co., LLC*, 99 F. Supp. 3d 708, 719 (E.D. Ky. 2015). *See also GATX Corp. v. Addington*, 879 F. Supp. 2d 633 (E.D. Ky. 2012). Under the statutes, the Plaintiffs only have a cause of action for fraudulent conveyance against the transferor (S&R) and the transferee (Yard Park), and no claim for aiding and abetting exists. Therefore, the motion for summary judgment as to the aiding and abetting claim is **GRANTED**.

### E. REMAINING CLAIMS

Finally, the Court must address what claims remain in this case. As stated above, the Plaintiffs' fraudulent conveyance claim may proceed as it pertains to the $13,050.04 transferred from S&R to Yard Park. In their filings arguing for and against reopening the period for dispositive motions (DN 79, 81), the parties seem to agree that the claims decided in this opinion are the only claims remaining. However, there have been no dispositive rulings on Counts 3, 8, and 13 (unjust enrichment); Counts 4, 9, and 14 (conversion of the unreturned equipment); and Counts 5, 10, and 15 (seeking return of the retained equipment). The claims for unjust enrichment were adequately disposed of when the Court granted summary judgment on the breach of contract claims, as unjust enrichment is an alternative theory of recovery based on the same conduct. Therefore, Counts 3, 8, and 13 are **DISMISSED**. As to the claims for conversion and seeking return of the unreturned equipment, a letter from counsel for the Defendants to counsel for the Plaintiffs after the initiation of the suit indicates that the Defendants "removed all property belonging the [the Plaintiffs] and stored it in a secure location . . . [in order to] coordinate a mutually convenient" retrieval. (DN 60-1.) Based on the parties' filings, the Court assumes that the property has been returned, and that these counts do not need to be litigated further.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART.**

*[Signature]*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

March 10, 2017

cc:   counsel of record